USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-1661

 MICHAEL D. CAREY, ET AL.,

 Plaintiffs, Appellant,

 v.

 MT. DESERT ISLAND HOSPITAL, ET AL.,

 Defendants, Appellees.

No. 97-1688

 MICHAEL D. CAREY, ET AL.,

 Plaintiffs, Cross-Appellees,

 v.

 MT. DESERT ISLAND HOSPITAL, ET AL.,

 Defendants, Cross-Appellants.

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Morton A. Brody, U.S. District Judge]

 Before

 Stahl, Circuit Judge,
 
 Aldrich and Coffin, Senior Circuit Judges.
 
 

 Jonathan B. Sprague, with whom A. James Johnston, Sidney R.
Steinberg, and Post & Schell, P.C. were on brief, for appellant.
 Peter B. Bickerman, with whom Sumner H. Lipman, Ronald E.
Colby, III, and Lipman & Katz, P.A. were on brief, for appellee.
 

August 18, 1998

 COFFIN, Senior Circuit Judge. Michael D. Carey brought this
suit against Mt. Desert Island Hospital ("MDI") for gender
discrimination in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. 2000e-2000e-17, and the Maine Human Rights Act,
5 M.R.S.A. 4551-4632. He alleged that he was discharged from
his position as Vice-President of Finance because he was male. 
 After a seven day trial, a jury returned a verdict in Carey's
favor, awarding compensatory and punitive damages of $210,000 and
$400,000, respectively. The district court reduced the $610,000 
total to $200,000 to conform with the statutory cap for awards of
compensatory and punitive damages under Title VII. See 42 U.S.C.
 1981a(b)(3)(C). The court declined to award front pay, reasoning
that it was included under the statutory cap, and was inappropriate
under the circumstances of the case. The court awarded back pay in
the amount of $110,070, making the total amount of recovery
$310,070.
 The parties cross-appealed, MDI attacking the verdict and
Carey challenging the post-verdict rulings limiting his recovery. 
MDI appeals on five points: (1) sufficiency of the evidence; (2) 
jury instructions on the role of gender discrimination in the
decision to terminate; (3) peremptory challenges to four female 
prospective jurors; (4) admission of certain deposition evidence;
and (5) admission of a remark by an MDI employee manifesting anti-
male animus. Carey argues that the court erred in failing to award
front pay and in limiting the back pay award. 
 Our review of the record reveals that this was a case with
much to say on either side, involving the always difficult question
of probing the wellsprings of human motivation. Moreover, it was
in our minds an exceptionally hard fought trial. While the verdict
could have gone either way, our review persuades us that no error
was committed below such as to justify reversal. We therefore
affirm the judgments.
 I. Sufficiency of the evidence
 Title VII makes it unlawful, inter alia, to discharge any
individual because of his sex. See 42 U.S.C. 2000e-2(a)(1). 
Where the plaintiff must prove his case by circumstantial evidence
in the absence of direct evidence, as here, "the plaintiff must
make out a prima facie case of discrimination, the employer must
then come forward with some non-discriminatory justification, and
the plaintiff finally is given the opportunity to convince the
trier of fact that the justification was pretextual and that the
real reason was discriminatory." Molloy v. Blanchard, 115 F.3d 86,
91 (1st Cir. 1997) (quoting Cuello-Suarez v. Puerto Rico Elec.
Power Auth., 988 F.2d 275, 278 (1st Cir. 1993)); see also McDonnell
Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973) (setting forth
the burden shifting framework); St. Mary's Honor Ctr. v. Hicks, 509
U.S. 502, 511 (1993). At all times, the plaintiff retains the
burden of persuasion. 
 There is no real dispute that Carey has established a prima
facie case, as he has shown that he had a satisfactory job
performance record but was terminated and replaced by a woman. SeeByrd v. Ronayne, 61 F.3d 1026, 1031 (1st Cir. 1995) (listing
requirements for the prima facie case) (citation omitted). And MDI
has presented a legitimate nondiscriminatory reason for
termination, namely, Carey's continued mismanagement of his
financial responsibilities. 
 Our focus in determining whether or not there was sufficient
evidence to justify the verdict therefore rests on the third stage
of the Title VII analysis -- whether Carey introduced sufficient
evidence to show that MDI's justification was false and that the
real reason for his discharge was gender. Carey may rely on the
same evidence to prove pretext and discrimination. See Udo v.
Tomes, 54 F.3d 9, 13 (1st Cir. 1995). In considering a claim of
insufficient evidence, we take the record in the light most
favorable to the verdict. See Troy v. Bay State Computer Group,
Inc., 141 F.3d 378, 382 (1st Cir. 1998). 
 A. Events leading to termination. 
 MDI is a thirty-nine bed community hospital in Bar Harbor,
Maine, with approximately 200 employees. In 1983, James Mroch, the
Hospital's CEO, hired Carey as Comptroller. In 1991, Carey was
promoted to Vice President of Finance. His responsibilities
included preparation of budgets and financial reports, working with
outside auditors, service on various committees, including the
Management Committee, and supervision of the Hospital's accounting
and business offices.
 The critical period in this case begins in January 1993 and
extends to June 1994. In January 1993, MDI's Board of Trustees
discharged Mroch, and Dan Hobbs carried out the duties of CEO until
September of that year. In the meantime, Lynda Tyson, who had
become a Board member in 1989 and chairperson in 1993, engaged a
professional recruiter, Anna Phillips, to find a permanent
replacement for Mroch. Carey applied for the position but in June
was told he would not be considered further. In July 1993, after
its first choice, David Pagniucci, declined the offer, the Board
offered the job to Leslie Hawkins. She accepted and commenced
employment in mid-September 1993.
 In the interim, on April 30, 1993, MDI's new outside auditors,
Berry, Dunn, McNeil & Parker ("Berry, Dunn") prepared a "1993
Management Letter" reporting conditions observed during its end of
the fiscal year audit of MDI. The letter contained, without
specific identification, both "reportable conditions" and "other
observations." "Reportable conditions were defined as "matters .
. . relating to significant deficiencies in the design or operation
of the internal control structure that, in our judgment, could
adversely affect the Organization's ability to record, process,
summarize, and report financial data consistent with the assertions
of management in the consolidated statements."
 Shortly after Hawkins commenced her duties, in September 1993,
Tyson arranged a meeting with Hawkins, the Board, and the Berry,
Dunn auditors to discuss the Management Letter. Carey was not
invited. The auditors said that while the items in the letter were
serious and needed to be addressed, the finance department, with
some assistance, should be able to rectify them before the next
audit.
 In April 1994, Hawkins asked Carey to present a proposed
fiscal 1995 budget to the Board before April 30. Realizing one
week before the deadline that he could not complete the assignment
in time, Carey asked for and was granted a one month extension. In
May, he submitted a budget, which projected large deficits and some
high expenses. Hawkins and MDI's finance committee found the
proposal unacceptable and sent the budget back for reworking.
 In June, Hawkins met with the Berry, Dunn auditors, who told
her that the bulk of the deficiencies noted in the 1993 Management
Letter were still present. On June 23, Hawkins terminated Carey,
followed soon by his female assistant, Robinson. She gave as
reasons the uncorrected problems noted in the 1993 Management
Letter, lack of a budget, and lack of confidence in Carey and
Robinson. Hawkins advised Lynda Tyson, the Executive Committee,
and the full Board; all supported her action. 
 B. Pretext. 
 The series of events and concerns described above indicates a
very legitimate, non-discriminatory justification for discharging
Carey. More than speculation or random evidence of satisfactory
performance is required to constitute a sufficient basis for a jury
finding that incompetency and mismanagement were not the real
reason for the discharge. Cf. Byrd, 61 F.3d at 1030 (addressing
the summary judgment context). We therefore distill all the
evidence that points to pretext.
 We begin by examining Carey's work record. In evaluating
Carey in 1992, Mroch said:
 Mike works very hard, adapts quickly to change, and keeps
 going even when doing so is difficult. Mike has
 responded very well to difficult situations brought about
 by various board members. Mike's fiscal abilities are
 excellent.
More recent and therefore more germane is Hobbs' recommendation to
the CEO Search Committee in June 1993 that Carey be considered for
the position of CEO:
 I have worked closely with Mike since early February
 during this difficult budgeting process and Mike has
 shown great tact and diplomacy in negotiating with
 department heads in an attempt to reduce the budget
 expenses, particularly in payroll. I have been very
 impressed with the manner in which it was done and which
 made the decision more acceptable by those directly
 involved.
 Then there is the key 1993 Management Letter itself. What
sounds like a massive indictment could have been read by a
skeptical jury as a list of technical accounting recommendations to
be expected from a firm making its first impression on a client. 
Certainly, it appears difficult for a reader to distinguish what
the accountants deemed a fairly serious "reportable condition" from
one of the "other observations." The suggestions included
recording cash on hand to the general ledger, locking up the blank
checks, avoiding imposing too many payroll functions on a single
individual (i.e., using more personnel), retaining outpatient
records, insuring loss of records, and use of disaggregated balance
sheets to show that individual restricted funds are in monthly
balance. 
 A jury could reasonably conclude that nothing in this
suggested an alarming hazard or a smoking gun, such as that
portrayed by Hawkins. Indeed, at least five of the recommendations
ended with the observation that the finance staff was already
attacking the problem. Berry, Dunn highlighted that many balance
sheet accounts were not regularly reconciled or analyzed, requiring
that numerous audit adjustments be made. They also explained in
conclusion: "This letter appears critical by its nature because it
is intended to present suggestions for management's consideration. 
It does not comment on the positive aspects we noted in the
Hospital's system of internal accounting control and procedures
during our engagement."
 Even more revealing may have been the auditors' June 21, 1994
status letter prepared at Hawkins' request two days before Carey's
discharge. This letter identified the areas listed in the 1993
letter that remained problematic. In contrast to normal practice,
it was developed without input from Carey and his staff. Berry,
Dunn auditors concluded that the bulk of deficiencies were still
present in 1994. But upon a close reading of the 1993 and 1994
letters the jury might have understood the letters quite
differently. 
 The 1993 letter occupied six pages and contained thirteen
areas of criticism, whereas the 1994 letter had three pages, with
five surviving areas of criticism. The remaining eight areas of
reported deficiencies had been resolved, substantially improved,
or, in one area, could not be addressed due to equipment
malfunction. The principal remaining problem was inability to
reconcile balance sheet accounts to supporting documentation. 
This, of course, might have been a critical shortcoming, but the
jury need not have so concluded. Such a status letter, even in the
absence of staff opportunity to defend and explain, might well have
appeared to the jury as less than a clarion call for termination.
 The jury also heard the testimony of Carey's expert witness,
Israel Laeger, senior member of a Bangor, Maine, accounting firm.
Laeger had reviewed all CPA audits and management letters from 1990
to 1995. He pointed out that (1) a new accounting firm may seek to
impress a client with a sizeable list of criticisms; (2) 
"reportable conditions" are basically judgment calls that are the
product of the accountant's subjective view of seriousness; (3) an
"opinion audit" is one where the auditor can vouch for the accuracy
of a financial statement; (4) a "qualified opinion" means that
there are some "things not up to snuff" preventing an unqualified
opinion; (5) all the audit opinions of MDI were unqualified,
meaning that "they were given a clean bill of health"; and (6) the
number of deficiencies identified in audit reports had steadily
decreased from 1992 to 1994. Laeger concluded that nothing in the
audit reports and letters indicated that Carey was not living up to
his responsibilities as Chief Financial Officer.
 Finally, the jury might have doubted the facial justifications
advanced by Hawkins concerning the relative infrequency of meetings
between Hawkins and Carey, whose offices were in close proximity. 
And they may have suspected that she thwarted his ability to
succeed based on evidence that she refused to allow Carey to fill
all the budgeted positions allotted him, did not give him any
advance warnings of serious trouble despite earlier assurance that
she would inform him if she had problems with his job performance,
and the absense of any effort to institute "progressive discipline"
or corrective action, as was general practice, before dismissal.
 We therefore cannot say that disbelief of the reasons
proffered by MDI would be unsupported or unfounded.
 C. Evidence of gender discrimination. 
 This conclusion, however, would not be enough to support the
verdict. It may very well be that Hawkins, Tyson, and the entire
Board had come to the point where they did not like Carey's style,
finding him too openly critical of others and insensitive in his
public utterances. If such were the real motivation for his
discharge, it might or might not be fair but certainly would not be
discrimination prohibited by law. It therefore was incumbent on
Carey to introduce sufficient evidence to enable a reasonable jury
to find that the justifications advanced by MDI for his discharge
were a cover for an underlying anti-male animus.
 In a case such as this, where a plaintiff must rely on
circumstantial as opposed to direct evidence of gender
discrimination, the evidence will necessarily be composed of bits
and pieces, which may or may not point to an atmosphere of gender
discrimination. While an employer should not find itself in
jeopardy by reason of occasional stray remarks by ordinary
employees, 
 circumstantial evidence of a discriminatory atmosphere at
 a plaintiff's place of employment is relevant to the
 question of motive in considering a discrimination claim.
 . . . [E]vidence of a corporate state-of-mind or a
 discriminatory atmosphere is not rendered irrelevant by
 its failure to coincide precisely with the particular
 actors or timeframe involved in the specific events that
 generated a claim of discriminatory treatment.
Conway v. Electro Switch Corp., 825 F.2d 593, 597-98 (1st Cir.
1987)(citations omitted).
 The record reveals the following evidence in support of 
Brennan's claim of sex based discriminatory animus:
 -- In August 1992, Fundraising and Public Relations Director
(and member of the Management Committee) Carol Gordon had a
discussion with Carey and another employee about a television
program on child abuse at day care centers. She concluded the
discussion with, "we live in a patriarchal society, and men shirk
their duties toward child raising. And because men have money,
power and position, because they have penises, then this is the
type of thing that happens as a result." Carey told Evans that the
remarks were inappropriate and filed a sexual harassment complaint
with the Personnel Director, Penny Evans. Shortly thereafter,
Evans expressed regret to Carey that he had taken her remark the
wrong way and that he had filed a complaint.
 -- In late 1992, the steering committee for MDI's new Women's
Health Center, whose members included Jeanne DuLong, Director of
Nursing, Evans, Gordon, and Carey (the only male), prepared a
mission statement for the Center. As first drafted, the statement
barred the employment of men, including male physicians. Carey
objected to the draft, indicated it could be illegal and sought a
legal opinion. After obtaining the opinion, the mission statement
was changed so as not to exclude men.
 -- In the spring of 1993, a management committee member, Brian
McCarthy, complained to Evans about another employee's having
thrown water in his face. He testified that Evans was not
receptive to his complaint, telling him not to worry about it. 
When he asked what she would do in the event water was thrown at a
female employee, Evans said the person would probably be fired. 
She explained, "we have different standards for men and women."
 -- Tyson, then Vice-Chair of the Board, helped secure the
discharge of Mroch as President and CEO. Upon his termination in
early 1993, she hired an executive search firm, placing Anna
Phillips in charge of identifying a prospective CEO for MDI. In
the summer of 1993, Gordon, Brian McCarthy, David Frongillo,
Director of the MDI Pharmacy, and Hawkins, who was then a
candidate, met with Phillips. Frongillo asked if there was a
selection criterion involving gender, to which Gordon responded,
"it's about time that we get a woman for this position," and
Phillips said that "they would very much like to put a woman in
that position." Meanwhile, Carey's own application received short
shrift. He testified that Phillips interviewed him for only about
thirty minutes, never asked about his qualifications, and appeared
not to have read his resume. Tyson testified that Evans, DuLong,
and Gordon had all told her that they would not be "comfortable
with Mr. Carey as CEO." 
 -- By the time Hawkins was hired, Tyson and Gordon were close
friends, as were Evans and Gordon, and all were uncomfortable with
Carey. When Hawkins was hired, Tyson told her that she faced
several challenges, "one of which was the financial stability and
. . . that she might have some problems in the finance department." 
 -- In late 1993, MDI conducted an employee opinion survey, a
summary of which was placed in an administrative mailbox used by
both Carey and Hawkins. Although obviously intended for Hawkins,
Carey saw the responses and noted on the summary page a statement
from an unnamed employee that Hawkins needed to take action against
"the power-hungry men in administration." Although the comment
itself is entitled to little weight, that this message was intended
for administration eyes and that the compiler of the survey results
saw fit to place the comment on the summary page for Hawkins are
more significant.
 -- Finally, Carey, when facing performance problems, appears
to have been treated differently by Hawkins than were Evans,
Gordon, and DuLong. Although only Carey and DuLong were Vice-
Presidents, the other two were senior managers and all served on
the Management Committee. "The test is whether a prudent person,
looking objectively at the incidents, would think them roughly
equivalent and the protagonists similarly situated. . . . Exact
correlation is neither likely nor necessary, but the cases must be
fair congeners." Molloy, 115 F.3d at 91 (quoting Dartmouth Review
v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)). All three
women had encountered problems in their jobs and were given
"progressive discipline," i.e., assistance and time to take
corrective action, rather than prompt termination.
 MDI in its briefs and argument compartmentalizes the above
evidence, isolating each incident, relationship, or statement,
arguing that each has no bearing on any animus that could have
influenced Hawkins. But all of the evidence was presented to the
jury and we would find it very difficult indeed to say that the
totality fell below a triable threshold. The statements and
incidents did not relate to miscellaneous low level employees but
to a fairly tight group of top officials. We therefore hold that
there was sufficient evidence to support a finding that
deficiencies in Carey's handling of financial controls were not the
real reason for his discharge but instead covered an action
stemming from gender discrimination. 
 We see no point in separately analyzing the court's refusal to
order a new trial. As is evident from our discussion on the 
sufficiency of the evidence, we do not consider the court's action
to be an abuse of discretion. See Simon v. Navon, 71 F.3d 9, 13
(1st Cir. 1995).
 II. Jury Instructions
 MDI argues that the court in its original jury instructions
committed error by charging that the plaintiff had the burden of
showing by a preponderance of the evidence that "gender was a
motivating factor" in MDI's decision to fire him. It had urged the
court to use the words "a determining factor" or "the motivating
factor," reasoning that, in cases resting on circumstantial rather
than direct evidence, such language should be used to accord with
our opinions in LeBlanc v. Great American Ins. Co., 6 F.3d 836,
842, 846 (1st Cir. 1993), and Mesnick v. General Elec. Co., 950
F.2d 816, 828 (1st Cir. 1991). 
 The court resisted, observing that in LeBlanc and other First
Circuit cases we have used both "motivating" and "determining"
without any clear indication that one was preferable. The court
was persuaded that "a motivating factor" was the correct
instruction by the wording chosen by Congress in Section 107(a) of
the Civil Rights Act of 1991, an amendment to the Civil Rights Act
of 1964. Section 107(a), codified as 42 2000e-2(m), states, "an
unlawful employment practice is established when the complaining
party demonstrates that . . . sex . . . was a motivating factor for
any employment practice, even though other factors also motivated
the practice."
 MDI argues that the court misapplied 42 2000e-2(m), which it
maintains covers direct but not circumstantial evidence cases, and
therefore committed reversible error. What MDI has not adverted to
in its brief was that after the jury had been out for about ninety
minutes, the jury sent the court a note asking for a legal
definition of "motivating factor" with specific reference to "how
much weight is to be rendered to make decision." What followed
was, in our opinion, of crucial importance insofar as decision in
this case is concerned.
 Court and counsel proceeded to engage in a substantial
colloquy, spanning eighteen pages of transcript. After hearing
argument from counsel, the court dictated a draft supplemental
instruction, which read in relevant part:
 The plaintiff therefore has the burden of establishing
 that it is more likely than not that gender was a
 motivating or determining factor in the firing of the
 plaintiff by the defendant. In other words, it is for
 the jury to determine, based on all the evidence, that it
 is more likely than not that the defendant's decision to
 terminate the plaintiff was motivated by gender
 discrimination. If you find that the plaintiff was
 discharged for reasons other than his gender you must
 find for the defendant.
 At this juncture, Carey's counsel proposed adding, at the end
of the first sentence, "even though other factors also motivated
the practice." The court expressed concern that the proposed
addition "conveys an impression that they need not concern
themselves with what really caused the termination. As long as
there's a drop of causal effect by any of these factors in the mix,
they can find for the plaintiff." 
 Carey's counsel then tried to persuade the judge to drop the
last sentence. Before doing so, the court called upon MDI's
counsel to weigh in on the proposed language. MDI's counsel 
responded as follows:
 MR.. JOHNSTON: Well, I think that last sentence is a
 perfectly accurate statement of the law, and I don't
 think it's misleading at all.

 MS. FARRELL (co-counsel): It does balance out the rest of
 it.
After the court refused a request by Carey's counsel to add that
gender discrimination need not be the sole motivating factor, the
court accepted the draft supplemental instruction, unchanged. 
 We are aware of the controversy that exists over whether the
"a motivating factor" language in 42 U.S.C. 2000e-2(m) applies to
all discrimination cases, as the language indicates, or was
intended only to overrule in part the standard set forth in Price
Waterhouse v. Hopkins, 490 U.S. 228 (1989). If the latter is true,
as MDI maintains, then the amendment is limited to "direct
evidence/mixed motive" cases and leaves unscathed the McDonnell
Douglas approach to "circumstantial evidence/pretext" cases. We
see no need to enter this thicket at the moment. For the purposes
of this case we assume that the court's original instruction was in
error.
 But we look upon the court's colloquy with counsel, the
supplemental instruction, and the input from counsel as a thorough
and effective effort to clarify an earlier misunderstanding. The
first sentence of the supplemental instruction, it is true, does
not specify what factor is determinative. But the second sentence,
beginning with "in other words," narrows the meaning, clarifying
that the decision must have been motivated by gender. If any doubt
were to remain, the last sentence clearly conveys the thought that
the defendant escapes liability unless the plaintiff establishes
that the sole motivation was gender. Indeed, if anything, this
wording favors defendant more than it should, for it goes beyond
the concept of "determining," requiring that if any reason other
than gender played, however minimal, a part in the discharge, Carey
may not recover.
 To cap all this, both counsel for MDI affirmatively indicated
their approval of the supplemental instruction to the court. In
our opinion, to hold under these circumstances that the trial court
committed reversible error would impose an unrealistic burden of
perfection on a court facing the constant pressures of trial.
 III. Miscellaneous Issues
 As a very small tail on a very long dog, several other issues
raised by MDI may be touched upon briefly. The first is that
Carey's counsel, by peremptorily challenging four female potential
jurors, and indicating that he was, in so doing, relying on a juror
rating system which consisted of such factors as occupation,
education, and familiarity with the local region, violated the
teaching of Batson v. Kentucky, 476 U.S. 79 (1986). Inasmuch as
MDI challenged three males and one female, the jury as drawn
contained five men and five women, and, after Carey offered his
rating system explanation, MDI indicated to the court that it had
no more questions on the Batson issue, we find it difficult to find
that the court abused its discretion in not pursuing explanations
any further.
 MDI also claims error in the admission into evidence of
deposition testimony of Anna Phillips, which allegedly included 
hearsay and irrelevant material. MDI makes cursory reference in
its brief to "feminist" beliefs of members of the search committee,
arguing that these were not relevant to the present case. We
confess ourselves unable, upon a thorough search of the record, to
identify such material in Phillips' testimony. In any event, we 
cannot believe that in this lengthy trial discussion by Phillips of
"feminist" beliefs held by persons at MDI could have made any
impact. No case of reversible error has been made to us. 
 We find the same as to certain notes of Phillips that were not
admitted into evidence but allowed to be shown in an overhead
projector. MDI tells us they were "inherently unreliable,
prejudicial and irrelevant." But we are not told just what they
were and how they would have adversely impacted MDI. We expect
more from counsel serious about asserting reversible error.
 Finally, MDI claims error in admitting over objection Gordon's
"penis and power" comment, with which we commenced our search for
gender discriminatory indicia. The specific claim is that the
prejudicial effect of the comment greatly outweighed its probative
value. Were this an isolated remark or incident, this would be a
more viable argument. But in context, particularly in light of the
evidence of Gordon's close friendship with Tyson and her senior
position in management, we simply cannot say that the court abused
its discretion in admitting the evidence. To ask for a new trial
on the basis of this ruling strains our credulity.
 IV. Front and Back Pay
 Carey appeals the denial of front pay and the partial
reduction of his back pay award for failure to mitigate damages. 
We review the district court's decision to deny these awards for an
abuse of discretion. See Selgas v. American Airlines, Inc., 104
F.3d 9, 12-13 (1st Cir. 1997) ("[t]rial courts have discretion to
fashion awards in Title VII cases so as to fully compensate a
plaintiff in a manner that suits the specific facts of the case"). 
 Carey alleges error in the court's conclusion that front pay
was included under the statutory cap, see 42 U.S.C. 
1981a(b)(3)(C), and that such an award was unnecessary given other
relief granted Carey. We elect not to address the statutory cap
issue as we find the district court's determination that Carey
received sufficient compensation without front pay to be entirely
within the court's discretion. 
 The court addressed the merits of Carey's front pay request on
two occasions. On November 20, 1996, after receiving briefing from
both parties on the front pay issue, the court ruled that front pay
is included under the statutory cap and 
 in any event, the Court would be reluctant to award
 additional front pay in this case because of the
 substantial liquidated damages awarded by the jury . . .
 [A]ny additional award of front pay would be
 inappropriate under the circumstances of this case. 
 Wildman v. Lerner Stores Corp., 771 F.2d 605, 616 (1stCir. 1985) [finding that future damages were unnecessary,
 given that the plaintiff had been awarded compensatory
 damages, liquidated damages, and double and additional
 damages under state law].

And on February 20, 1997, the court denied Carey's motion to
reconsider, stating, 
 [w]hether front pay is included under the statutory cap
 or not, the Court indicated that it would not award
 Plaintiff front pay in this case. The $200,000 in
 damages Plaintiff will recover after the jury's award of
 $610,000 is capped, plus the back pay the Court will
 award Plaintiff, the exact amount of which is still
 uncertain, will more than adequately compensate
 plaintiff.

 We discern from these statements that the court appears to
have looked to the jury's award of punitive damages rather than to
the statutorily capped damage award in denying front pay on
November 20, 1996. While this was inappropriate as the liquidated
damages award was not an accurate measure of the award Carey would
actually receive, it is clear that on February 20, 1997, the court
found the $200,000 cap and back pay award fully sufficient to
compensate Carey. This determination, standing alone, is entirely
supportable, and we can see no basis to conclude, as Carey would
have us do, that it was "tainted" by the November 20, 1996 ruling. 
We can find no "strong evidence of a lapse in judgment," Selgas,
104 F.3d at 12, as required for a finding of an abuse of
discretion. 
 Neither can we discern an abuse of discretion as to the back
pay award. Carey was entitled to recover for what he would have
earned absent the discharge, reduced by any compensation that he
actually received and any additional amount that he would have
received through reasonable efforts to mitigate the damages, with
the employer bearing the burden of proof on the issue of
mitigation. See Troy, 141 F.3d at 382; Wilcox v. Stratton Lumber,
Inc., 921 F. Supp. 837, 842 (D. Me. 1996); 42 U.S.C. 2000e-
5(g)(1). 
 Correctly applying this standard, the court concluded that MDI
had successfully shown through expert testimony and evidence
concerning the actual number of applications made relative to the
number of positions available that Carey did not exercise
reasonable diligence in seeking comparable employment. The result
was an award to Carey of $110,070 in back pay, which represented a
reduction by $100,000 for failure to fully mitigate damages and a
reduction by the amount of money Carey earned or received in
unemployment during the relevant period. 
 In support of his abuse of discretion argument, Carey
essentially repeats the evidence he presented below, relying
particularly on testimony from his expert to rebut evidence by
MDI's expert. We see no need to pursue this further. The court's
order demonstrates a thoughtful weighing of the credibility of the
witnesses and the various evidence presented by each party,
resulting in an award that was somewhere in between that desired by
each party. Such weighing was fully within the court's discretion
and is supported by the evidence. V. Conclusion
 We therefore affirm the district court on all issues raised
by both parties on appeal. Each party shall pay its own costs.
 Concurrence and dissent follow. ALDRICH, Senior Circuit Judge, concurring. The difficulty of
the issue that principally divides the court is indicated by the
fact that discussion of the jury's question that led to a three
sentence supplemental instruction, occupies 18 pages of transcript. 
My disagreement with our dissenting brother is based on my
assessment of the jury's thinking as shown by its question, and my
belief that if a jury hears twice from the same source it is likely
to emphasize, if not concentrate on, what it has last heard.
 The jury's question is interesting. We do not have the exact
language, but it appears to have requested a legal definition of
"motivating factor," and "how much weight is to be rendered to make
a decision?" Since it had been instructed as to what is generally
needed to meet the burden of proof I assume great thought went into
this question: Is it enough for gender to be a concurrent factor,
or does motivating require sufficient weight to itself effect the
decision? This last is what it was told. What the dissent labels
as part (b) of the court's response to the question, "not
necessarily inconsistent with the established standards governing
pretext cases," (a bit overgrudging, I prefer "consistent" to not
"necessarily inconsistent") the dissent would diminish because
presumably "colored by the original 'a motivating factor'
instruction." But was it not just because the jury was not
satisfied by the original instruction that it asked for
illumination? With great respect, is it not unfair to say that the
questioned shadow persisted? I say particularly unfair when
defendant's last remark was an assent. The jury had received an
apparently full answer to its question, and I do not believe it is
to be thought to have reached back and modified it by what had
bothered it before. I read (b) and (c) together as understood to
mean that plaintiff must show that discrimination was of sufficient
weight to itself warrant the discharge, and it was in fact the
activating cause. To this defendant can have no complaint. STAHL, Circuit Judge, dissenting. The majority "assume[s],"
for purposes of analysis, that the district court's original charge
was in error, but concludes that its response to the jury's
question about the meaning of the erroneous "motivating factor"
instruction was fully curative, and/or that MDI's counsel waived
its objection by acceding to a portion of the court's supplemental
instruction. Because I cannot agree that the defendant hospital
either waived its objection to or was not prejudiced by the
erroneous instruction, and because I believe it important to
explain why the original instruction was erroneous, I respectfully
dissent.
 I.
 Employment discrimination cases involving claims of disparate
treatment can be divided into two broad categories: (1) cases in
which the plaintiff has "direct" evidence of discrimination, and (2)
cases in which the plaintiff's evidence of discrimination is
"indirect." See, e.g., Smith v. F.W. Morse & Co., 76 F.3d 413, 421
(1st Cir. 1996). Under prevailing law, the proper
characterization of a plaintiff's case as direct or indirect
largely determines the manner in which the plaintiff may establish
the defendant's liability.
 Where the plaintiff's proof is indirect (as will typically be
the case), the plaintiff's claim normally will be adjudicated in
accordance with the familiar rules laid out in the line of cases
beginning with McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973), see F.W. Morse, 76 F.3d at 421, and recited in the panel
majority's opinion, see ante. At the time of the enactment of the
Civil Rights Act of 1991 ("1991 Act"), cases in which a plaintiff
had direct evidence of discrimination were governed not by
McDonnell Douglas, but by Price Waterhouse v. Hopkins, 490 U.S. 228
(1989). See, e.g., Jackson v. Havard Univ., 900 F.2d 464, 467 (1st
Cir. 1990). Under the Price Waterhouse rule, if a plaintiff
introduced direct evidence of discrimination sufficient to
demonstrate (by a preponderance of the evidence) that an
impermissible consideration (race, gender, etc.) was a motivating
factor in the contested job action, the burden of proof then
shifted to the defendant to prove that it would have taken the same
job action against the plaintiff even absent the impermissible
motivating factor. See Jackson, 900 F.2d at 467. If the defendant
succeeded in so proving, it avoided liability altogether. SeePrice Waterhouse, 490 U.S. at 244-45 (plurality opinion); id. at
261-62, 271 (O'Connor, J., concurring).
 Against the backdrop of McDonnell Douglas and Price
Waterhouse, Congress in 1991 amended Title VII of the Civil Rights
Act of 1964 by adding two new subsections. Section 107(a) of the
1991 Act provided the following:
 Except as otherwise provided in this title, an unlawful
 employment practice is established when the complaining
 party demonstrates that race, color, religion, sex, or
 national origin was a motivating factor for any
 employment practice, even though other factors also
 motivated the practice.

1991 Act, Pub. L. No. 102-166, 107(a), 105 Stat. 1071, 1075
(1991) (emphasis added) (codified at 42 U.S.C. 2000e-2(m)). 
Section 107(b) further added:
 On a claim in which an individual proves a violation
 under [ 107(a)] and a respondent demonstrates that the
 respondent would have taken the same action in the
 absence of the impermissible motivating factor, the
 court--

 (i) may grant declaratory relief (except as provided in
 clause (ii)), and attorney's fees and costs demonstrated
 to be directly attributable only to the pursuit of a
 claim under [ 107(a)]; and

 (ii) shall not award damages or issue an order requiring
 admission, reinstatement, hiring, promotion, or payment,
 described in subparagraph [42 U.S.C. 2000e-5(g)(2)(A)].

Id., 107(b), 105 Stat. at 1077 (codified at 42 U.S.C. 2000e-
5(g)(2)(B)(i)-(ii)).
 The 1991 Act was, in large part, Congress's response to a
series of Supreme Court decisions interpreting various provisions
of the federal civil rights laws. See Landgraf v. USI Film
Products, 511 U.S. 244, 250 (1994). Section 107 was specifically
intended to address and overturn, in part the holding of Price
Waterhouse. See id.; Tanca v. Nordberg, 98 F.3d 680, 681-82 (1st
Cir. 1996), cert. denied, 117 S. Ct. 1253 (1997); see also H.R.
Rep. No. 102-40(I) (Education and Labor Committee), at 45-47
(1991), reprinted in 1991 U.S.C.C.A.N. 549, 583-86; H.R. Rep. No.
102-40(II) (Judiciary Committee), at 16-19 (1991), reprinted in1991 U.S.C.C.A.N. 694, 709-12.
 Under Section 107, if a plaintiff proves that at least one of
the motivating factors for the defendant's employment action was an
impermissible one i.e., that the defendant acted, at best, with
"mixed motives" liability under Title VII is established. 42
U.S.C. 2000e-2(m). Section 107 thus abrogates the holding of
Price Waterhouse, insofar as that decision permitted an employer
with "mixed motives" to avoid liability altogether by proving that
it would have taken the same job action against the plaintiff
absent any impermissible motivation. Under Section 107, such proof
by an employer does not provide a basis for avoiding liability, but
does preclude any recovery of damages by the plaintiff and also
bars certain important forms of injunctive relief, including
reinstatement. See 42 U.S.C. 2000e-5(g)(2)(B)(ii).
 While it is clear, then, that Section 107 displaces the rule
of Price Waterhouse, it is less clear whether Section 107 should
have any application in cases traditionally litigated under
McDonnell Douglas. The conceptual problem arises from the fact
that the "a motivating factor" rubric of 2000e-2(m) which was
incorporated in the district court's instructions here is
directly at odds with the established understanding of the
plaintiff's burden of proof in the McDonnell Douglas framework,
particularly as delineated in cases like St. Mary's Honor Ctr. v.
Hicks, 509 U.S. 502, 506-07 (1993).
 Within the McDonnell Douglas framework, a plaintiff bears the
ultimate burden of persuading the trier of fact that the
defendant's proffered reasons for the challenged job action are a
pretext for discrimination, i.e., that the "true reason" for the
decision was discriminatory. See Hicks, 509 U.S. at 507-08, 515,
517; Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st Cir.
1994), cert. denied, 514 U.S. 1108 (1995); Woods v. Friction
Materials, Inc., 30 F.3d 255, 260 (1st Cir. 1994). To say that a
particular motivation was the "true reason" for an action must mean
at least that absent that motivation that is to say, but for it
 the action would not have occurred. Bibbs v. Block, 778 F.2d
1318, 1321 (8th Cir. 1985) (en banc). Thus, satisfying McDonnell
Douglas's burden of proof must entail persuading the finder of fact
that the determinative reason for the adverse job action was notthe rationale proffered by the defendant, but was, instead,
discrimination. See Loeb v. Textron, Inc., 600 F.2d 1003, 1019
(1st Cir. 1979) (interpreting McDonnell Douglas to require
plaintiff to prove that discriminatory motive was "the
determinative factor" or "but for" cause of adverse job action); seealso Hartsell v. Duplex Products, Inc., 123 F.3d 766, 772 (4th Cir.
1997); Simon v. City of Youngstown, 73 F.3d 68, 70 (6th Cir. 1995);
Wilson, 55 F.3d at 130 (quoting Miller v. Cigna Corp., 47 F.3d 586,
598 (3d Cir. 1995) (en banc)); Maguire v. Marquette Univ., 814 F.2d
1213, 1216 (7th Cir. 1987). Certainly, proving that discrimination
was just one motivating factor among other, nondiscriminatory
factors which is all that is required to prove liability under
 2000e-2(m) cannot suffice to establish that the discriminatory
motive was causally determinative, and hence cannot be enough to
establish liability and a right to recovery under McDonnell
Douglas. See Goostree v. Tennessee, 796 F.2d 854, 863 (6th Cir.
1986) ("The mere showing that 'sex was a factor' rather than a 'but
for' factor is insufficient to establish liability under Title
VII.").
 The incompatibility of 2000e-2(m) with McDonnell Douglas is
further demonstrated by the close relationship between 2000e-2(m)
and 2000e-5(g)(2)(B). If 2000e-2(m) applied to every disparate
treatment case, then 2000e-5(g)(2)(B) would be triggered in every
such case in which the plaintiff prevailed (since the prevailing
plaintiff necessarily would have proved a violation under 2000e-
2(m)). As noted above, 2000e-5(g)(2)(B) permits a defendant to
avoid damages and certain other consequences by demonstrating that
it would have "taken the same action" absent a discriminatory
motive. 42 U.S.C. 2000e-5(g)(2)(B). But in cases where a
plaintiff has prevailed under McDonnell Douglas, the factfinder
necessarily will have found that discrimination was the "true
reason" for the defendant's action. See, e.g., Hicks, 509 U.S. at
507-08. In such cases, it would be absurd to ask the factfinder
also to determine, as 2000e-5(g)(2)(B) would require, whether the
defendant would have "taken the same action" absent a discriminatory
motive.
 The most plausible way to resolve the apparent conflict
between 2000e-2(m) and McDonnell Douglas is to limit the
application of 2000e-2(m) to "mixed motive" cases that fit the
Price Waterhouse mold (cases in which the plaintiff has "direct
evidence" of discrimination), and hold it inapplicable in "pretext"
cases governed by McDonnell Douglas. This is a more sensible
solution, in any event, than drawing the conclusion that Congress,
in enacting 2000e-2(m), intended effectively to abrogate the
central tenets of the McDonnell Douglas canon.
 The legislative history of the 1991 Act indicates that Section
107 was specifically intended to address the Supreme Court's
holding in Price Waterhouse with respect to the standards of proof
governing liability in "mixed motive" cases. See H.R. Rep. No. 102-
40(I), supra, at 48, 1991 U.S.C.C.A.N. at 586 ("Section [107] of
the legislation . . . overrules one aspect of the Supreme Court's
decision in Price Waterhouse."); H.R. Rep. No. 102-40(II), supra,
at 16-17, 1991 U.S.C.C.A.N. at 709-10 (same); see also 137 Cong.
Rec. S15476 (Oct. 30, 1991) (interpretive mem. submitted by Sen.
Dole) (same); 137 Cong. Rec. H9529 (Nov. 7, 1991) (interpretive
mem. submitted by Rep. Edwards) (same). Dicta in one Supreme Court
decision and in two of our own prior decisions support this same
conclusion. See Landgraf, 511 U.S. at 251 ("[Section] 107 responds
to Price Waterhouse . . . by setting forth standards applicable in
'mixed motive' cases."); Tanca, 98 F.3d at 681-82 ("Congress
partially overruled Price Waterhouse in the 1991 Act by allowing a
finding of liability and limited relief to plaintiffs in mixed
motive cases."); Smith v. F.W. Morse & Co., 76 F.3d 413, 419 n.3
(1st Cir. 1996) ("[T]he Price Waterhouse framework for proof of
'mixed motive' discrimination . . . is somewhat changed under the
1991 Act."). There is absolutely no indication, on the other hand,
that Congress intended the 1991 Act to overturn or even affect any
aspect of McDonnell Douglas or its derivatives.
 It would be implausible to assume that Congress, in enacting
 2000e-2(m) to address one part of the Supreme Court's decision in
Price Waterhouse, also intended, sub silentio, to eradicate the
established legal landscape governing the litigation of disparate
treatment cases. Cf. Square D Co. v. Niagara Frontier Tariff
Bureau, Inc., 476 U.S. 409, 418-22 (1986) (legislation overturning
a recent Supreme Court decision involving one particular
application of a longstanding judicially constructed rule could not
be read as implicit rejection of the entire framework of the rule
applied in the overturned decision). A far more reasonable
proposition is that 42 U.S.C. 2000e-2(m) was meant to describe
the standard for establishing liability only in "mixed motive"
cases, not in standard "pretext" cases governed by McDonnell
Douglas. See Fuller v. Phipps, 67 F.3d 1137, 1143-44 (4th Cir.
1995) ("Section 107 was intended to benefit plaintiffs in mixed-
motive cases; it has nothing to say about the analysis in pretext
cases such as this one."). Under this reasoning, a district court
errs by giving a jury instruction pursuant to 2000e-2(m), unless
the court determines that the plaintiff has adduced evidence of
discrimination sufficient to take the case outside the McDonnell
Douglas paradigm, and I would so hold.
 Here, neither party has argued and the district court never
ruled that this case is anything but a standard "pretext" case
governed by the principles of McDonnell Douglas. Yet, the
district court, explicitly relying on 42 U.S.C. 2000e-2(m),
instructed the jury that the plaintiff's burden was merely to prove
that his gender was "a motivating factor" in MDI's decision to fire
him. I would find (as the majority "assumes" without deciding)
that MDI's objection to this instruction was well-founded. By
instructing the jury that Carey was entitled to prevail upon a
finding that discrimination had been merely "a motivating factor"
in MDI's decision to terminate him, the district court erroneously
understated the plaintiff's burden of proof under the governing
legal framework.
 II.
 But instructional error warrants reversal, of course, only if
it was prejudicial. See Federico v. Order of St. Benedict, 64 F.3d
1, 3-4 (1st Cir. 1995). The court's original "a motivating factor"
instruction, standing alone, unquestionably prejudiced the
defendant by materially understating the plaintiff's true burden of
proof. The majority does not dispute this fact. The majority
concludes, however, that the district court effectively cured the
error in its original instruction with its response to the jury's
question about the meaning of "motivating factor." I disagree.
 As a preliminary matter, it is important to understand that
the court's so-called "supplemental instruction" was, at best, just
that a supplement to the original instruction, given in response
to a question that came from the jury after it had already retired
to deliberate. The court at no time instructed the jury that the
original "a motivating factor" charge was incorrect, to be
disregarded, or in any way problematic. Nor did the court advise
the jury that the supplemental instruction, to the extent it might
have been read as contradicting the original charge, was to be
given precedence. Thus, in assessing the question of prejudice, we
must ask not simply whether the supplemental instruction itself
provided an accurate statement of the law (a question I would
answer in the negative, see infra), but whether that instruction 
even if it was correct was sufficiently overriding and forceful
in its import that we could confidently say that the jury applied
the correct rule of law, in spite of the error contained in the
original instruction. Cf. Arthur D. Little, Inc. v. Dooyang Corp.,
No. 98-1010, slip op. at 13-14 (1st Cir. June 25, 1998) ("We assume
the jury listens to and follows the judge's entire charge."
(emphasis added)); Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994)
(reversing jury's verdict where a particular instruction, though
"standing alone, was proper," could have prejudiced appellant when
"taken together" with certain other problematic language).
 In its supplemental instruction, the court stated to the jury
that (a) "the plaintiff . . . has the burden of establishing that
it is more likely than not that gender was a motivating or
determining factor in the firing of the plaintiff by the
defendant"; (b) "it is for the jury to determine . . . [whether] it
is more likely than not that the defendant's decision to terminate
the plaintiff was motivated by gender discrimination"; and (c) "If
you find that the plaintiff was discharged for reasons other than
his gender you must find for the defendant." This response, in my
view, was not sufficient to obviate the prejudicial effect of the
court's original instruction.
 As the majority appears to agree, sentence (a) does not
accurately describe the plaintiff's burden of proof under McDonnell
Douglas and thus could not have been curative.
 Sentence (b), considered in isolation, is not necessarily
inconsistent with the established standards governing pretext
cases, insofar as the "motivated by" formulation leaves open the
critical issue of how much of a causative role discrimination must
have played in the defendant's decisionmaking. But because the
jury was never told that sentence (b) was to trump any conflicting
statements in the original instruction, we cannot realistically
assume that the jury did consider that sentence in isolation from
the "a motivating factor" charge. To the contrary, it only seems
fair to presume that the jury's understanding of sentence (b) was
colored by the original "a motivating factor" instruction, and I do
not see how we can discount the possibility that the jury thought
it could find that the defendant was "motivated by" discrimination
so long as gender animus was "a motivating factor." In any event,
I do not think it possible to conclude that the jury, by virtue of
sentence (b), must have understood that it could return a
plaintiff's verdict only if it found that discrimination had been
determinative in the hospital's decision to fire Carey.
 To a limited extent, sentence (c) might be thought to have
lessened the prejudicial effect of the original instruction, by
suggesting to the jury that a defendant's verdict was in order ifthe jury could "find" that the plaintiff's discharge was caused, to
some unspecified degree, by nondiscriminatory reasons. But this is
a far cry from saying that sentence (c) provided the jury with a
correct understanding of the law. Keeping in mind, again, that the
district court never told the jury to disregard the original "a
motivating factor" instruction, it would seem more than likely that
the jury understood the instructions, as a whole, to require it to
return a verdict in Carey's favor if it found discrimination to be
"a motivating factor" in his termination, unless per sentence (c)
 it "f[ou]nd" that Carey was fired "for reasons other than his
gender." This is, of course, an incorrect understanding of the
law: a finding that discrimination was "a motivating factor" is
insufficient to satisfy the plaintiff's burden of proof in a
pretext case, regardless whether the jury could or could not "find"
that there were non-discriminatory reasons for the plaintiff's
discharge. See Hicks, 509 U.S. at 523-24 ("Title VII does not
award damages against employers who cannot prove a
nondiscriminatory reason for adverse employment action, but only
against employers who are proven to have taken adverse employment
action by reason of (in the context of the present case)
[gender].").
 Thus, sentence (c), like (a) and (b), failed to provide the
jury with an adequate recitation of the legal standard governing
the plaintiff's burden of proof, and the supplemental instruction
did not cure the erroneous "a motivating factor" instruction.
 III.
 The question remains whether MDI somehow waived any argument
that it was prejudiced by the district court's "a motivating factor"
jury instruction. The majority makes much of the fact that, at a
few points in the colloquy following the jury's question, defense
counsel appeared to accede to the giving of the supplemental
instruction, and endorsed sentence (c) of that instruction in
particular. It must be remembered, however, that this entire
discussion was prompted by the jury's question about the meaning of
"motivating factor," a phrase that had been adopted by the district
court only over the defendant's duly-lodged objection. The
colloquy preceding the court's giving of the supplemental
instruction did not provide an apt occasion for MDI to reargue
whether it had been proper for the district court to give the "a
motivating factor" instruction in the first place.
 It is only from this perspective that one can fairly
understand what the majority refers to as MDI's "affirmative[]
. . . approval of the supplemental instruction." In fact, in the
course of finally acceding to the supplemental instruction which,
again, was really a response to the jury's question about language
in the original instruction to which MDI had already objected MDI
expressly reserved its argument that the district court had
incorrectly instructed the jury on the plaintiff's burden of proof. 
This is what MDI's counsel actually said:
 although, you know, our position [is] that it should be
 a 'determining/but for' standard, and I don't want to
 waive that argument, I think that this [the court's
 proposed response to the jury] is acceptable in light of
 the court's prior ruling.

I can see nothing in this statement that compromised the
defendant's ability to argue, on appeal, that it was prejudiced by
the court's "a motivating factor" instruction.
 It is true, as the majority observes, that MDI's counsel at
one point did explicitly endorse sentence (c) of the supplemental
instruction as a correct statement of the law. I have tried to
explain above why I believe (c) was not a fully accurate statement. 
It is a bit more difficult to say, however, just what effect MDI's
concession should have. On the one hand, it certainly should bar
MDI from arguing that the inclusion of sentence (c) in the
supplemental instruction was itself reversible error; but that is
not a position that MDI has taken in this appeal. On the other
hand, MDI's endorsement of sentence (c) surely cannot be taken as
a waiver of its argument that the "a motivating factor" instruction
constituted prejudicial error. MDI's counsel at no time conceded
that the supplemental instruction, with or without sentence (c),
was sufficient to cure the asserted error in the original charge. 
In fact, counsel explicitly noted for the record that the hospital
did not want to waive its original objection.
 In these circumstances, I see no reason that the concession of
MDI's counsel as to statement (c) should require this court, in
assessing whether MDI was prejudiced by the "a motivating factor"
charge, to conclude that statement (c) effectively cured that
erroneous instruction. A contrary outcome, it seems to me, would
create a rule of waiver that imposes on trial counsel a "burden of
perfection" as "unrealistic" as the burden that the majority asserts
would befall the trial court if we were to call for a new trial in
this case.
 For all of the reasons stated, I would vacate the judgment and
remand this case for a new trial.